IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LORI A. LINDEMANN, )
)
Plaintiff, )
)
vs. ) Case No. 17-cv-308-JPG-CJP
)
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security, )
)
Defendant. )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Lori A. Lindemann, represented by counsel, seeks judicial review of the final agency decision denying her application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Ms. Lindemann applied for disability benefits in July 2013. She initially claimed disability going back to 2004, but later amended her alleged onset date to July 9, 2013. After holding an evidentiary hearing, Administrative Law Judge (ALJ) Nathaniel Plucker denied the application on October 3, 2016. (Tr. 24-34.) The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1.) Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred in evaluating the credibility of plaintiff's statements about her pain.

2. The ALJ failed to consider plaintiff's anxiety as a severe impairment at Step 2.

## Applicable Legal Standards

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines "disabled" as "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 1382c(a)(3)(D). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 416.972.

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 416.920(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but the impairment is neither listed in nor equivalent to the impairments in the regulations—failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id.*; *see*

*also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## The Decision of the ALJ

ALJ Plucker followed the five-step analytical framework described above. He determined that Ms. Lindemann had not worked at the level of substantial gainful activity since the alleged onset date. He found that plaintiff had severe impairments of a diffuse connective tissue disease and major depression.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level with some mental limitations. Based on the testimony of a vocational expert (VE), the ALJ concluded that plaintiff could not do her past work but that she was not disabled because she was able to do other jobs which exist in significant numbers in the national and regional economies.

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1.      Agency Forms**

Plaintiff was born in 1964 and was almost 49 years old on the alleged date of onset. (Tr. 273.) She said she was unable to work because of Lupus and "mental conditions." She was 5'8" and weighed 150 pounds. In the 15 years before she applied for benefits, she had worked at one job, in a Dollar Tree store, in 2009 and 2010. (Tr. 277-78.)

**2.      Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in August 2016. (Tr. 42.)

Plaintiff testified that she was able to read, write and do basic math. She left school in the tenth grade. As an adult, she took a training course in clerical office work. (Tr. 49-50.)

Plaintiff's two daughters and two grandchildren lived with her. (Tr. 48.) From February to June 2016, plaintiff babysat her grandchildren and was paid by the State of Illinois. (Tr. 51.)

Plaintiff said she was unable to work because of joint problems and inability to sleep. She said she had been diagnosed with Lupus twenty years ago. She had gastrointestinal problems, urine leakage, constant itching from a skin disease, and pins and needles sensation in her feet. Her hair was falling out. Her left knee "pops out." She said she had problems with confusion and forgetfulness, which might be related to lack of sleep or age. She was tired all the time. She had dizzy spells and "diabetic symptoms." (Tr. 55-59.) Plaintiff said she was incontinent of urine at least three times a week. That started after gallbladder surgery in 2001 or 2002. (Tr.

62-63.) She also said she was "half blind" in her left eye. (Tr. 66.) She said she had headaches. (Tr. 68.)

Plaintiff testified that she had problems with anxiety and depression. She became frustrated when she could not do things because of pain. She was taking medication, which helped "a little bit." (Tr. 60.) Sometimes she just stayed in bed and did not take a shower. She had anxiety attacks once a week. (Tr. 64-65.)

A VE also testified. The ALJ asked her a hypothetical question which corresponded to the ultimate RFC findings, that is, a person who was able to do light exertion work, limited to simple, routine tasks, simple work-related decisions, and only occasional interaction with the public and coworkers. The VE testified that this person could not do plaintiff's past work but that she could do other jobs such as housekeeper, hand packager and laundry worker. (Tr. 70-72.)

### 3. Medical Records

Ms. Lindemann began seeing Dr. Edward Rose, a rheumatologist, in July 2015. She had been referred by her primary care physician, Dr. Adams, because of a positive ANA level.[1] Dr. Rose described her as a "difficult historian with some push of speech and tends to be tangential." Her major complaint was pain in the hands and feet and a sense of her joints "cracking." She said she had low-grade fevers and fatigue for at least ten years. She complained of rashes on her arms and face. Since she had gallbladder surgery, she had nausea after eating but no diarrhea. She said she had been diagnosed with Lupus in California and had then gotten disability benefits. She was unable to say what the symptoms of Lupus were or how the diagnosis was made. She said

---

[1] "An ANA test detects antinuclear antibodies (ANA) in your blood. Your immune system normally makes antibodies to help you fight infection. In contrast, antinuclear antibodies often attack your body's own tissues — specifically targeting each cell's nucleus. In most cases, a positive ANA test indicates that your immune system has launched a misdirected attack on your own tissue — in other words, an autoimmune reaction. But some people have positive ANA tests even when they're healthy." https://www.mayoclinic.org/tests-procedures/ana-test/about/pac-20385204 (visited Jan. 30, 2018).

she was prescribed Naproxen. On exam, she had no rash. The joints in her hands were normal, and she could make a fist with both hands. Musculoskeletal exam was normal "despite complaints of swelling." Her knee joints were normal. There were no trigger points. The assessment was diffuse connective tissue disease, unspecified. Dr. Rose prescribed Prednisone and Plaquenil. (Tr. 372-74.)

Ms. Lindemann returned to Dr. Rose in September 2015. She did not take the medications he had prescribed. She said she slept only three hours a night. Physical exam was normal except for minimal flexion contractures in the elbows and possible small effusion on the left. Dr. Rose again told her to take Prednisone and Plaquenil. (Tr. 361-62.) In November 2015, she reported that she stopped taking the medications because they did not do anything. Physical exam was again basically normal. Dr. Rose concluded that she had poorly defined symptoms that had been present for at least ten years. Her labs did not suggest active disease. Dr. Rose thought that there was some psychopathology. He did not see enough to justify immunosuppressive or high dose steroid therapy. His plan was to evaluate for organ involvement. (Tr. 354-55.)

In March 2016, plaintiff told Dr. Rose that she had taken an Adderall and some Xanax given to her by a friend, and she "felt much better." Her labs showed "no sign of a systemic disease." Physical exam was much the same, except she had painful abduction in the right shoulder with normal range of motion. She declined a steroid injection for her shoulder. Dr. Rose was unable to make a diagnosis of a Lupus-like disease. He noted that, if she had such a disease, it was stable, non-life threatening and non-progressive after ten years. He suspected that her major problem was psychiatric, which was reinforced by her response to psychotropic drugs. She asked for a prescription for Adderall, but he declined to prescribe it and suggested she talk to her primary care physician. He gave her one non-refillable prescription for Xanax. She was to

return in six months.  (Tr. 379-81.)

Dr. Rose saw plaintiff again in August 2016 and listed a diagnosis of Lupus Systemic.  He did not explain why he made that diagnosis, but his plan was to "observe without specific treatment."  Physical exam was again basically normal except for minimal flexion contractures in the elbows and painful abduction of the right shoulder.  She was taking Xanax and another medication prescribed by a psychiatrist.  Dr. Rose noted that she had a "considerable anxiety problem" but seemed better now that she was on medication.  (Tr. 397-98.)

Plaintiff saw a psychiatrist, Dr. Habib, once each month from April to July 2016.  Her primary care physician and her lawyer suggested that she see him.  Her chief complaint was "need Adderall to focus."  She was babysitting her grandchildren in her home.  She felt depressed and hopeless.  Her sleep and appetite were good.  Mental status exam was basically normal except that her judgment and insight were limited.  Dr. Habib diagnosed major depressive disorder, recurrent.  He prescribed Wellbutrin and counseling.  In May, she reported she had stopped Wellbutrin after two days because it made her sleepy.  She again asked for Adderall.  Dr. Habib prescribed Cymbalta.  In June, she was "much better on Cymbalta."  Her sleep was better.  In July, she was "doing allright" even though she had not taken Cymbalta for three weeks.  Her mood was okay and her sleep was fair.  Mental status exam was basically normal.  (Tr. 391-96.)

Counselor Jane Fitzpatrick wrote a report summarizing her counseling sessions with plaintiff.  Ms. Lindemann attended six sessions from May to August 2016.  Her daughters (ages 20 and 22) and grandchildren (ages 3 and 1½) lived with her.  She took care of the children while their mothers worked in the evenings.  She said that her anxiety exacerbated her Lupus symptoms and that she had "big flare ups" of Lupus.  She also complained of fatigue.  She said she had suffered from a painful skin condition and that she was under the care of Dr. Tobin, a

dermatologist. On exam, her affect was blunted and her mood was depressed. Her attention was normal, but she focused on irrelevancies. She "demonstrated a continued pattern of insufficient sleep." (Tr. 399-402.)

The transcript does not contain any records from plaintiff's primary care physician or dermatologist.

### 4. Treating Doctors' Opinions

Both Dr. Rose and Dr. Habib declined to complete functional assessment reports requested by plaintiff's counsel. (Tr. 345, 382.)

### 5. Consultative Examinations

Vittal Chapa, M.D., performed a physical exam in December 2013. The exam was normal. (Tr. 341-43.)

Harry J. Deppe, Ph.D., performed a psychological exam in December 2013. Plaintiff told him that she was seeking disability benefits because of occasional bladder leakage. Her sleep was "mostly okay." She was not taking any medications. She said she exercised every day and she liked to cook. Dr. Deppe diagnosed adjustment disorder with mixed emotional feature but concluded that she could relate to coworkers, understand and follow simple instructions, and maintain attention to perform simple, repetitive tasks. Her prognosis was good. (Tr. 337-40.)

## Analysis

Plaintiff attacks the ALJ's conclusion that her statements about the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical and other evidence.

The ALJ cited to Social Security Ruling (SSR) 16-3p, 2016 WL 1119029 (Mar. 16, 2016), which became effective March 28, 2016, *see* 2016 WL 1237954, and superseded the previous SSR

on assessing a claimant's credibility. SSR 16-3p eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." 2016 WL 1119029, at *1. SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 416.929(c)(3).

Plaintiff first argues that the ALJ failed to consider the possibility that plaintiff's mental illness caused her to believe that she was experiencing disabling pain.

The Seventh Circuit Court of Appeals has recognized that physical symptoms may have a psychiatric origin; not all physical symptoms result from physical causes which can be objectively detected. *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). This does not mean, of course, that the ALJ can never consider the absence of objective medical evidence in weighing the accuracy of the plaintiff's claims. As the Seventh Circuit Court of Appeals later explained, the error in *Carradine* was that the ALJ "failed to appreciate the psychological nature of the claimant's somatoform disorder and relied primarily on the lack of objective medical data to support his conclusions." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).

Here, of course, plaintiff has not been diagnosed with somatoform disorder, and no doctor concluded that she was experiencing physical pain resulting from her psychological condition. Dr. Rose did, of course, suggest that there was a psychological component to her presentation, but he never expressed the opinion that plaintiff actually experienced the symptoms that she claimed before the ALJ. Therefore, the record does not support plaintiff's argument.

Further, plaintiff's argument is doomed by the fact that she claimed to suffer from a variety of problems beyond subjective pain – problems that were actually refuted by or never referred to in the medical records. She claimed that she suffered from a painful and itchy rash, but Dr. Rose never found any rashes or other skin abnormalities. She claimed she suffered from ongoing

urinary incontinence, dizzy spells, "diabetic symptoms," and headaches, but the medical records contain no indication that she ever sought treatment for those conditions. She claimed she was "half blind" in her left eye, but Dr. Chapa tested her vision as 20/30 in that eye. (Tr. 342.) Plaintiff offers no basis for the ALJ to conclude that her psychological condition caused her to experience these problems.

Plaintiff also argues that the ALJ was mistaken in saying that the records of the counselor, Ms. Fitzpatrick, conflicted with the Dr. Habib's records. This argument ignores the obvious discrepancy between the two. Ms. Fitzpatrick's report painted a more dire picture than Dr. Habib's record did. Dr. Habib documented basically normal mental status exams and noted improvement once plaintiff started taking Cymbalta. In particular, her sleep improved, which, as the ALJ correctly noted, contradicts Ms. Fitzpatrick's statement that she continued to have insufficient sleep.

Plaintiff's other arguments about the ALJ's assessment of the reliability of her statements are either nitpicking or not supported by the record. For instance, she quarrels with the ALJ's consideration of the fact that she was able to take care of two young children, arguing that she mainly watched them while they were sleeping. This point is refuted by plaintiff's own testimony that she generally babysat beginning at 3:30 or 4:00 p.m. and put the children to bed at 9:00 p.m. (Tr. 54.)

Plaintiff's second point is that the ALJ failed to identify anxiety as a severe impairment at Step 2. This argument is a nonstarter. The designation of severe impairments at Step 2 is a threshold issue. The failure to designate a particular impairment as "severe" at Step 2 does not matter to the outcome of the case as long as the ALJ finds at least one severe impairment, continues on with the analysis, and considers the combined effect of all impairments, severe and

non-severe.  *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (citing *Castile v. Astrue*, 617 F.3d 923, 927-28 (7th Cir. 2010)).

Plaintiff does not identify any limitations arising from anxiety that are not accounted for by the ALJ's RFC determination.  She points out that, on an agency form, plaintiff wrote that she diagnosed herself with "'Unheimlichkeit', (Tr. 300) which means eeriness or uncanniness" (Doc. 15 at 15).  Plaintiff does not explain the significance of this observation.

Plaintiff has not identified any error requiring remand.  Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  ALJ Plucker's decision is supported by substantial evidence, so must be affirmed.

## Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Plucker committed no errors of law and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Lori A. Lindemann's application for disability benefits is **AFFIRMED**.

The Clerk of Court is **DIRECTED** to enter judgment in favor of defendant.

**IT IS SO ORDERED.**
**DATE:   February 12, 2018**

                s/ J. Phil Gilbert
                **J. PHIL GILBERT**
                **UNITED STATES DISTRICT JUDGE**